UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STATE OF IDAHO, a sovereign State of the United States<br><br>                    Plaintiff,<br>          v.<br><br>COEUR D'ALENE TRIBE, a federally recognized Indian tribe,<br><br>                    Defendant. | Case No. 2:14-cv-000170-BLW<br><br>MEMORANDUM DECISION AND ORDER |

# I
# INTRODUCTION

The Court has before it Defendant Coeur d'Alene Tribe's Motion to Dismiss (Dkt. 15) and Plaintiff the State of Idaho's Motion for a Temporary Restraining Order and for a Preliminary Injunction (Dkts. 3, 4). The Court previously stayed this lawsuit based on the Tribe's argument that the parties had agreed to arbitrate this dispute. *See June 23, 2014 Order,* Dkt. 35. Afterward, the Tribe changed its mind and decided it would prefer

to litigate.  The Court will therefore address the pending motions.[1]  For the reasons expressed below, the Court will deny the Tribe's motion to dismiss and grant the State's motion for injunctive relief.

## II
## BACKGROUND

In early May 2014, the Coeur d'Alene Tribe began conducting Texas Hold 'em tournaments at the Coeur d'Alene Casino. Texas Hold 'em is a poker game.  Idaho has expressly prohibited all forms of gambling other than: (1) a state lottery; (2) pari-mutuel betting on horse, dog, and mule races; and (3) certain bingo and raffle games.

Shortly after the Tribe began conducting the tournaments, the State sued the Tribe in this Court, seeking to enjoin the tournaments.  The State contends that poker is a prohibited form of gambling in Idaho and, further, that the Tribe is violating the parties' Class III Gaming Compact by conducting the poker tournaments.  The Tribe, however, says that (1) Texas Hold 'em does not fit Idaho's definition of "gambling," (2) the parties' Compact does not address Texas Hold 'em; and (3) this Court lacks subject-matter jurisdiction over this dispute.

## III
## THE MOTION TO DISMISS

In moving to dismiss, the Tribe invokes tribal sovereign immunity.  "Tribal sovereign immunity protects Indian tribes from suit absent express authorization by

---

[1] Earlier, the Court denied the State's motions for injunctive relief as moot.  *See June 23, 2014 Order*, Dkt. 35, at 9.  Given the Tribe's subsequent election to litigate, however, these motions are no longer moot and the Court will decide them on the merits.  Similarly, the Court had previously granted the Tribe's motion to dismiss, but the Court had only addressed the arguments related to the arbitration issue.  *See id.*  The Court will now resolve the remaining, substantive issues raised by the motion to dismiss.

Congress or clear waiver by the tribe." *Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 725 (9th Cir. 2008). The State says Congress authorized this lawsuit in 25 U.S.C. § 2710(d)(7)(A)(ii). This section states that federal district courts have jurisdiction over a lawsuit initiated by a state or an Indian tribe to "enjoin [1] a class III gaming activity located on Indian lands and [2] conducted in violation of any Tribal-State compact . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii). The Tribe acknowledges that this statute could potentially abrogate sovereign immunity, but contends that neither criterion is met here. That is, the Tribe says (1) Texas Hold 'em is not a Class III gaming activity, and (2) the Tribe is not violating the Compact by conducting the Texas Hold 'em tournaments. The Court disagrees on both points.

## A. Texas Hold 'em is a Class III Game

Texas Hold 'em is a Class III game as that term is defined in the Indian Gaming Regulatory Act (IGRA).

### 1. Classification of Indian Gaming Under IGRA

Congress passed IGRA in 1988 to provide a statutory basis for operating and regulating gaming conducted by Indian tribes. *See* 25 U.S.C. § 2702. The Act divides gaming on Indian lands into three classes – I, II, and III – and provides a different regulatory scheme for each class.

Class I gaming "means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations," 25 U.S.C. § 2703(6), and is left by the Act to "the exclusive jurisdiction of the Indian tribes . . . ." § 2710(a)(1).

Class II gaming is defined to include bingo, games similar to bingo, and – relevant to this case – certain "card games." 25 U.S.C. § 2703(7)(A)(i) and (ii). Class II card games are defined as being either (i) card games "explicitly authorized by the laws of the State" *or* (ii) card games that "are not explicitly prohibited by the laws of the State *and* are played at any location in the State, but only if such card games are played in conformity with those laws and regulations (if any) of the State regarding hours or periods of operation of such card games or limitations on wagers or pot sizes in such card games." 25 U.S.C. § 2703(7)(A)(ii)(I) to (II). Banking card games, electronic games of chance, and slot machines are expressly excluded from the scope of class II gaming. § 2703(7)(B). Regulation of class II gaming contemplates a federal role, but places primary emphasis on tribal self-regulation. *See* § 2710(b).

Class III gaming is a catch-all category. It is defined to include "all forms of gaming that are not class I gaming or class II gaming." § 2703(8). It is the most heavily regulated of the three classes. The Act provides that class III gaming is lawful only if these gaming activities are:

(1) authorized by an ordinance or resolution that (a) is adopted by the governing body of the Indian tribe, (b) satisfies certain statutorily prescribed requirements, and (c) is approved by the Chairman of the National Indian Gaming Commission,

(2) "located in a State that permits such gaming for any purpose by any person, organization, or entity, and"

(3) "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . ."

§ 2710(d)(1)(A)-(C).

Because Class III is a residual definition, the first step to determine whether any particular game is a Class III game is to ask whether the game is a Class I or II game. Nobody is arguing that Texas Hold 'em is a Class I game, so the question becomes whether Texas Hold 'em is a Class II game. That question raises a series of sub-questions:

    (1)    Is Texas Hold 'em a card game that is explicitly authorized by the State of Idaho?

    (2)    Is Texas Hold 'em explicitly prohibited by the laws of the State of Idaho?

    (3)    If Texas Hold 'em is *not* explicitly prohibited, is the game "played at any location in the State" in conformity with any State laws and regulations regarding "hours or period of operations . . . or limitations on wagers or pot sizes . . . ."

*See* 25 U.S.C. § 2703(7)(A)(ii)(I)-(II). The Court will address each question in turn.

## 2. Idaho's Gambling Laws

The first and second questions task the Court with determining whether Idaho has either "explicitly authorized" or "explicitly prohibited" Texas Hold 'em. This is a question of law to the extent that the Court is simply determining the meaning of relevant Idaho statutory and constitutional provisions or if it is applying the law to a set of undisputed facts.[2] *See United States v. DiCristina*, 726 F. 3d 92, 105 (2d Cir. 2013) ("whether poker constitutes gambling under the IGBA [Illegal Gambling Business Act] is purely a question of statutory interpretation, and therefore raises only a question of law");

---

[2] During the hearing on these motions, the Court considered conducting an evidentiary hearing to determine jurisdiction. However, upon reviewing the record, the Court has determined that no such hearing is necessary, as it can decide the key question – whether Texas Hold 'em is a Class III game – as a matter of law.

*Ramadan v. Gonzales*, 479 F.3d 646, 648 (9th Cir. 2007) (per curiam) (a "question of law" includes an issue of statutory construction as well as the application of law to undisputed facts).

This Court concludes that Idaho law explicitly prohibits a person from playing Texas Hold 'em for money or any other thing of value.

Idaho's constitution strictly prohibits all forms of gambling, with just three specific exceptions: (1) a state lottery, (2) pari-mutuel betting, and (3) certain bingo and raffle games. The applicable provision reads as follows:

> Gambling is contrary to public policy and is strictly prohibited except for the following:
>
> a. A state lottery which is authorized by the state if conducted in conformity with enabling legislation; and
>
> b. Pari-mutuel betting if conducted in conformity with enabling legislation; and
>
> c. Bingo and raffle games that are operated by qualified charitable organizations in the pursuit of charitable purposes if conducted in conformity with enabling legislation.

Idaho Const., art. III, § 20(1)(a)-(c). After laying out these three exceptions, the constitution goes on to say that none of the three permissible forms of gambling may "employ any form of casino gambling including, but not limited to . . . *poker* . . . ." *Id.* § 20(2) (emphasis added).

The parties agree that Texas Hold 'em is a poker game. As such, it is relatively easy to conclude that the game is a prohibited form of gambling in Idaho. The Tribe, however, argues that while some poker games might be prohibited under Idaho law,

Texas Hold 'em is not prohibited because it is a game of skill rather than a game of chance. In advancing this argument, the Tribe relies on the Idaho's definition of gambling, which is as follows:

> "Gambling" means risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance, the operation of a gambling device or the happening or outcome of an event, including a sporting event, the operation of casino gambling including, but not limited to, blackjack, craps, roulette, poker, bacarrat [baccarat] or keno, . . . .

Idaho Code § 18-3801. The legislature excludes from this definition "bona fide contests of skill, speed, strength or endurance in which awards are made only to entrants or the owners of entrants." § 18-3801(1).

The Tribe says that although Texas Hold 'em is a poker game, it is qualifies as a "bona fide contest of skill" and thus cannot be included in the definition of gambling. There are several problems with this argument.

To begin, this argument largely ignores the clear, broad, and "strict" prohibition against gambling in Idaho's constitution. Plainly, Idaho's constitution allows just three forms of gambling. Poker is not one of the three. To the contrary, it is specifically listed as a prohibited form of gambling.

The Tribe attempts to sidestep this difficulty by pointing out that the term "poker" is modified by the phrase "any form of casino gambling." *See* Idaho Const., art. III, § 20(1) (none of the permitted forms of gambling "shall employ any form of casino gambling including, but not limited to, . . . poker . . . ."). According to the Tribe, "casino

gambling" should be interpreted to mean house-banked games only.  So, the Tribe concludes, Idaho has authorized non-house-banked poker games.

The Court is not persuaded.  It bears repeating that Idaho's constitution plainly prohibits all forms of gambling other than the three listed exceptions.  Given this prohibition, it makes no sense to say that the constitution actually meant to say – indirectly – that non-house-banked poker is permissible, because that sort of poker is not "casino gambling."

The second problem with the Tribe's assertion argument that poker is a game of skill is Idaho's statutory definition of "gambling."  As already noted, this definition says gambling means to risk money "*in whole or in part . . . upon chance . . .*".  Idaho Code § 18-3801 (emphasis added).  There is no dispute that in a game (or a series of games) of Texas Hold 'em, players risk money at least *partly* upon chance.  So even if the statute did not expressly refer to "poker," Texas Hold 'em would fit the definition of gambling.  But should there be any doubt on this point, the legislature expressly listed "poker" as a form of gambling.

The Tribe concedes, as it must, that chance plays a role in Texas Hold 'em.  After all, when a poker player is dealt a hand, chance determines how good or bad that hand will be.  There is no skill involved in that part of the game – ever.  As one court has observed, "No amount of skill can change a deuce into an ace."  *Joker Club, L.L.C. v. Hardin*, 643 S.E. 2d 626, 630 (N.C. Ct. App. 2007) (concluding that Texas hold 'em is a game of chance).  Or, put another way, "[a] player may be skilled at playing the odds but

he is still playing the odds." *Alabama ex rel. Tyson v. Ted's Game Enters.*, 893 So. 2d
355, 375 (Ala. Civ. App. 2002) (internal quotation marks omitted).

Still, though, despite the role of chance, the Tribe argues that a player's skill will
ultimately predominate in the context of a Texas Hold 'em tournament. This argument
might gain traction if Idaho had defined contests of chance to mean games where the
outcome depended *mostly* – or to "a material degree" – upon chance.[3] If that were the
case, the Court would probably need to further analyze the game to determine whether
chance or skill predominates.[4] But Idaho law does not leave room for this sort of an
inquiry. Rather, the Court easily concludes that poker – which includes Texas Hold 'em
– is a prohibited form of gambling in Idaho. To the extent *Idaho v. Kaspar*, Case No.
CRMD20139859, Dist. Ct. of Idaho (4th Dist., Ada County) (slip ops. dated May 14,

---

[3] In fact, several states have adopted such language. *See* Alaska Stat. § 11.66.280(1) (defining a
"contest of chance" to mean "a contest, game, gaming scheme, or gaming device in which the outcome
depends in a material degree upon an element of chance, notwithstanding that the skill of the contestants
may also be a factor"); Haw. Rev. Stat. § 712-1220(3) (same); Mo. Rev. Stat. § 572.010(3) (same); N.J.
Stat. Ann. § 2C:37-1(a) (same); N.Y. Penal Law § 225.00(1)-(2) (same); Or. Rev. Stat. § 167.117(6)
(same); Wash. Rev. Code § 9.46.0225 (same).

[4] It appears that most courts have determined that Texas Hold 'em and other poker variants are
games of chance rather than skill. *See, e.g. Pennsylvania v. Dent,* 992 A.2d 190, 192, (Pa. Super. Ct.
2010) (finding that Texas Hold 'em is a game of chance: "while the outcome of poker may be dependent
on skill to some degree, it is predominately a game of chance"); *Joker Club, L.L.C. v. Hardin*, 643 S.E.2d
626, 630 (N.C. Ct. App. 2007) (poker is a game of chance because it "presents players with different
hands, making the players unequal in the same game and subject to defeat at the turn of a card"); *Plato's
Cave Corp. v. State Liquor Auth.*, 496 N.Y.S.2d 436, 437-38 (N.Y. App. Div. 1985) (video poker game fit
the definition of gambling because the outcome depends materially on the draw of the cards). *See
generally Three Kings Holding, LLC v. Six*, 255 P.3d 1218, 1227 (Kan. Ct. App. 2011) (determining that
a variant of Texas Hold 'em, known as Kandu, is a game of chance and further indicating that the "weight
of authority" supported this conclusion). *See generally* Steven D. Levitt, Thomas J. Miles, and Andrew
M. Rosenfield, *Is Texas Hold 'Em a Game of Chance? A Legal and Economic Analysis*, 101 Geo. L.J.
581 (2013) (reviewing and criticizing courts' application of the dominant-factor test).

2014 and July 22, 2014) suggests a contrary conclusion, the Court is not persuaded.[5]

The Court is also not persuaded by the Tribe's argument that Idaho should be viewed as allowing Texas Hold 'em to be played because of an alleged "general reluctance to enforce the actual prohibitions found in Idaho law against widespread social and charitable poker games . . . ." *Tribe's Resp. Br.*, Dkt. 16, at 2; *see also id.* at 17. To support this argument, the Tribe points to flyers advertising poker nights within the State of Idaho. The Tribe also points out that the State lottery has poker-themed scratch games. But just because unlawful poker gaming may have occurred in Idaho does not mean the law prohibiting that sort of gaming vanishes. If that were the case, all sorts of laws would be erased – starting with laws against speeding.

The Tribe also points to two Ninth Circuit decisions to supports its argument that Idaho allows poker games: *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250 (9th Cir. 1994) and *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003). Neither case ultimately supports the Tribe's position.

In *Rumsey,* the court held that "IGRA does not require a state to negotiate over one form of Class III gaming activity simply because it has legalized another, albeit similar form of gaming . . . ." 64 F.3d at 1258. Rather, "a state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have." *Id.*

In *Artichoke Joe's,* the court clarified that a state "permits" gaming if there is a

---

[5] These orders are reproduced in this Court's docket. *See* Dkt. 16-1; 38-1.

basis in state law, independent of a Tribal-State compact, for concluding that the state has authorized the gaming activity. In that case, California's Proposition 1A – a referendum effecting state constitutional change to permit Las Vegas-style gaming by tribes – provided such a basis. *See* 353 F.3d at 720-721 (rejecting contention of card clubs and charities that tribal-state compacts entered into after California Proposition 1A violated IGRA and equal protection rights).

Neither of these cases stands for the proposition that a state's law expressly prohibiting a particular form of gambling should be ignored because there is evidence there has been some unlawful gambling in the state.

In sum, the Court concludes that Texas Hold 'em is explicitly prohibited by Idaho law and, as such, is a Class III game under IGRA.

**B.    The Tribe Has Breached the Compact by Conducting the Texas Hold 'em Tournaments**

The Court also concludes that the Tribe has violated the parties' Class III Gaming Compact by conducting the Texas Hold 'em tournaments.

The Tribe argues that parties did not agree on *anything* about Texas Hold 'em in the Compact, which means it would be impossible for the Tribe to be breaching the Compact by conducting the tournaments. *See Reply,* Dkt. 15-1, at 12. This argument is based mainly on the Ninth Circuit's decision in *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050 (9th Cir. 1997). *Cabazon*, however, is distinguishable.

In *Cabazon*, which is a factually complex case, four Indian Bands operated simulcast wagering facilities on their tribal lands. The Bands sued the State of California,

seeking to force the State to turn over to the bands the licensing fees which the State collected from California's horse racing associations, which were based on revenues generated at the Bands' wagering facilities.

In the tribal-state compacts at issue in *Cabazon*, the State had agreed to pay these licensing fees if a federal district court declared the fees impermissible under IGRA. The Bands lost in district court, but won on appeal. The Ninth Circuit held that the fees were indeed impermissible under IGRA, and remanded the case to district court with instructions to enter summary judgment in favor of the Bands. *See Cabazon Band of Mission Indians v. Wilson,* 37 F.3d 430 (9th Cir. 1994).

After the remand, "the litigation entered . . . 'a new and confusing stage.'" *Cabazon,* 124 F.3d at 1054. The State refused to pay the fees to the Bands, declared the compacts invalid, and threatened to cut off the simulcast signal unless the Bands agreed to enter into negotiations for new compacts. In response, two of the Bands moved for an injunction to prevent the cessation of the signal. These bands also sought to enforce the compact provisions requiring the State to pay past and future licensing fees. The State opposed enforcement of these provisions. Among other things, the State argued that: (1) the district court lacked subject matter jurisdiction to enforce the Compacts; and (2) the Bands materially breached the Compacts by operating illegal gaming operations (slot machines), thus rendering the Compacts unenforceable against the State.

The Ninth Circuit rejected both of these arguments.

First, the court held that "IGRA necessarily confers jurisdiction onto federal courts to enforce Tribal–State compacts and the agreements contained therein." *Id.* at 1056.

The court explained that in passing IGRA, Congress "did not create a mechanism whereby states can make empty promises to Indian tribes during good-faith negotiations of Tribal–State compacts, knowing that they may repudiate them with immunity whenever it serves their purpose." *Id.*

As for the second argument – that the Bands had materially breached the Compacts by operating illegal slot machines – the court held that the State of California did not have regulatory authority over slot machine gaming because slot machines were not the subject of a Tribal-State compact. *Id.* at 1059. The court explained that "IGRA limits the state's regulatory authority to that expressly agreed upon in a compact. Outside the express provisions of a compact, the enforcement of IGRA's prohibitions on class III gaming remains the exclusive province of the federal government." *Id.*

A key teaching from *Cabazon* is that an Indian tribe does not consent to state regulation of Class III gaming activities unless those activities are actually covered in the compacts. *Id.* More to the point, courts cannot infer that when a tribe enters into a gaming compact on one type of game, that tribe is also implicitly agreeing "not to engage in gaming in violation of state law and IGRA." *Id.* at 1060 (quoting the district court's order).

Importantly, however, nothing in *Cabazon* prevents a tribe from *expressly* agreeing not to engage in gaming activities other than those specifically outlined in a compact. And that is precisely what happened here. In negotiating the Class III Gaming Compact, the Tribe and the State of Idaho initially agreed to disagree about the types of Class III games permissible under IGRA. *See Compact,* Dkt. 3-3, § 6.1 ("The parties

have been unable to agree upon the types of Class III games permitted by the Act to be played by the Tribe . . . .").  The parties agreed to resolve this dispute in federal district court.  *Id.* § 6.4.  They also agreed that if the State prevailed, the Tribe would limit its Class III games to (1) a lottery; (2) pari-mutuel betting on horse-, dog-, or mule-races; (3) the simulcast of these pari-mutuel races; and (4) "[a]ny additional type of game involving chance and/or skill, prize and consideration that may hereafter be authorized to be conducted in the State."  *Id.* § 6.2; *see also id.* § 6.5.1.

The State won this dispute many years ago, when this Court determined that "the State must negotiate with the Tribes only as to the conduct of a lottery and pari-mutuel betting on horse, mule, and dog races."  *See Coeur d'Alene Tribe v. Idaho,* 842 F. Supp. 1268, 1280 (D. Idaho 1994), *aff'd,* 51 F.3d 876 (9th Cir. 1995) (affirming the district court "substantially for the reasons advanced in its published opinion").  Given this ruling, the Compact obligates the Tribe to restrict its Class III games to the lottery, pari-mutuel betting, and the referenced simulcasts.  *See Compact* § 6.5.1 ("In the event the court(s) determines that no additional types of games are permitted in Idaho under the Act, the Tribe's gaming shall be limited to the gaming authorized in Article 6.2."); *id.* § 6.2 (referencing the lottery, pari-mutuel betting, and simulcasts).

Under these facts, the Tribe's reliance on *Cabazon* is misplaced.  Unlike the *Cabazon* compacts – which simply covered one type of gaming but did not mention other types of games – the parties here expressly agreed that the Tribe would not conduct other forms of Class III games.  As a result, the Tribe has violated the Class III Compact by conducting the Texas Hold 'em poker tournaments.

Because the Court has concluded that Texas Hold 'em is a Class III game and that the Tribe has violated the Compact by conducting the Texas Hold 'em tournaments, the Court has jurisdiction over this dispute under 25 U.S.C. § 2710(d)(7)(A)(ii).

## C.    Res Judicata

Given these rulings, the State's *res judicata* argument is arguably moot. Nevertheless, the Court will briefly explain why it independently satisfied itself that Texas Hold 'em is indeed a Class III game.

In raising the *res judicata* doctrine, the State hoped to prevent the Tribe from attacking this Court's jurisdiction. Specifically, the State argued that this Court's 1994 declaratory judgment precluded the Tribe from arguing that Texas Hold 'em is anything other than a Class III game. (Recall, if Texas Hold 'em were a Class II game, the Court would not have jurisdiction.)

Raising the *res judicata* doctrine in the context of dispute over a court's subject-matter jurisdiction raises an interesting theoretical question. If one party insists that the other is precluded from raising an argument that could defeat jurisdiction, this "raise[s] the possibility that we lack jurisdiction though issue preclusion forces us to pretend to exercise it." *Gospel Missions of Am. v. City of L.A.*, 328 F.3d 548, 554 (9th Cir. 2003). In other words, assuming that the Tribe were correct in arguing that Texas Hold 'em is a Class *II* game, but the Court was forced to ignore that reality due to *res judicata* principles, then the Court would be exercising jurisdiction even though it did not truly exist. This result is contrary to the basic notion that "[a] court must always decide for *itself* its own jurisdiction. *Id.* (*citing Steel Co. v. Citizens for a Better Env't*, 5234 U.S.

83, 94 (1998)).  Accordingly, this Court decided its own jurisdiction, which involved classifying Texas Hold 'em under IGRA.

**D.     Deferral to the National Indian Gaming Commission**

Lastly, this Court is not convinced by the Tribe's and the amicus's argument that the Court should allow the National Indian Gaming Commission (NIGC) to decide if Texas Hold 'em is a Class II or Class III game.  *See Response,* Dkt. 15-1, at 9; *Shoshone-Bannock Tribes Amicus Br.*, Dkt. 32,[6] at 3-4.

A New York federal district court rejected a similar argument in *New York v. Oneida Indian Nation*, 78 F. Supp. 2d 49, 58-59 (N.D.N.Y. 1999).  There, the State of New York alleged that the Oneida Indian Nation had violated the tribal-state compact by offering a new game in their casino.  *Id.* at 51.  The Oneida Nation moved to dismiss the complaint, arguing that, under the doctrine of primary jurisdiction, the State was required to present its claims to the National Indian Gaming Commission before suing in federal court.

The doctrine of primary jurisdiction allows a court to stay a proceeding or dismiss a complaint pending resolution "of an issue within the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008).  Primary jurisdiction applies in a limited set of circumstances, "only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a

---

[6] In deciding the pending motions, the Court considered all post-hearing, supplemental briefs, including the Shoshone-Bannock Tribes' Supplemental Amicus Brief.  *See* Dkt. 32.

regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Id.* (internal citations and quotation marks omitted). Although "'[n]o fixed formula exists for applying the doctrine of primary jurisdiction,'" *Davel Comm'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1086 (9th Cir. 2006) (citation omitted), the Ninth Circuit has considered whether (1) the issue is within the "conventional experiences of judges" or "involves technical or policy considerations within the agency's particular field of expertise," (2) the issue "is particularly within the agency's discretion," and (3) "there exists a substantial danger of inconsistent rulings." *Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658 F.3d 1038, 1048-49 (9th Cir. 2011). Lastly, despite what the term may imply, the doctrine of primary jurisdiction is not jurisdictional; it is a discretionary tool. *See Davel*, 460 F.3d at 1091.

The Court declines to dismiss or stay this case based on the doctrine of primary jurisdiction.[7]

*First*, classifying Texas Hold 'em under the definitional scheme laid out in IGRA does not involve technical or policy considerations within the NIGC's particular field of expertise. Rather, this inquiry involves interpreting Idaho statutory and constitutional law, a task this Court routinely performs. Further, as was the case in *Oneida Indian Nation*, the parties' compact "does not include novel words or unusual language that may need specialized understanding." 78 F. Supp. 2d at 58.

*Second*, classifying a game is not a discretionary call.

---

[7] Neither the Tribe nor amicus tethered their vague deferral arguments to the primary-jurisdiction doctrine, but the Court finds the analytical framework useful and will employ it here.

*Third*, the State has not applied to the NIGC for a determination, meaning that there is no danger of inconsistent rulings. *Accord Oneida Nation,* 78 F. Supp. 2d at 58-59 ("the State has not invoked the authority of the NIGC to resolve this dispute; thus, there exists no danger of inconsistent rulings if the case is decided by the Court because the issue presented involves the interpretation of a particular Compact.") (internal citations omitted). Further, to the extent there is a potential for a more general inconsistency between this Court's ruling and an NIGC determination, the State has the better argument because in 2004, the NIGC concluded that poker is not Class II gaming in Idaho. *See Dec. 21, 2004 Letter from NIGC Acting General Counsel to Hagg*, Dkt. 3-7, at 9-14. The Tribe's position in this lawsuit is generally contrary to that opinion.

Finally, the Court is unpersuaded by the Tribe's and amicus's remaining arguments, including, among other things, their fleeting references to comity, the tribal exhaustion doctrine, and exhaustion of remedies.

# IV
## THE STATE'S MOTION FOR INJUNCTIVE RELIEF

Having determined jurisdiction, the Court's next task is to rule on the State's motions for injunctive relief.

The standard for obtaining a preliminary injunction or a temporary restraining order is the same. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). In either case, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving

party; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council Inc.*, 555 U.S. 7, 20 (2008). The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## A.     Likelihood of Success on the Merits

For all the reasons discussed above, the Court finds that the State will likely succeed on the merits of its claim.

## B.     Irreparable Injury

The second factor – irreparable harm – is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." Charles Alan Wright, et al., 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.). The State, however, contends that irreparable harm is presumed in this case because a federal statute specifically provides for injunctive relief. *See* 25 U.S.C. § 2710(d)(7)(A)(ii). The Court is not convinced, due in large part to the Supreme Court's decisions in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) and *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). These cases cast significant doubt on the propriety of categorically presuming irreparable harm when a party seeks injunctive relief.

In *eBay*, the Court rejected the Federal Circuit's general rule that, absent extraordinary circumstances, a permanent injunction would issue once the plaintiff demonstrated that a valid patent had been infringed. 547 U.S. at 393-94. The Court held that "well-established principles of equity" required plaintiff to satisfy the traditional

four-factor test – which of course includes demonstrating irreparable harm.  Further, the

Court clarified that a "'major departure from the long tradition of equity practice should

not be lightly implied.'"  *Id.* (*quoting Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320

(1982)).

Two years later, in *Winter*, the Supreme Court reversed a Ninth Circuit decision

upholding an injunction that prevented the U.S. Navy from conducting certain training

exercises based upon a *possibility* of irreparable harm to marine wildlife.  555 U.S. at 20.

The Court held that the "frequently reiterated standard requires plaintiffs seeking

preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an

injunction."  *Id.* at 22.

Since *eBay* and *Winter*, the Ninth Circuit has addressed the continuing vitality of

presumptions of irreparable harm in injunction cases.  In *Antoninetti v. Chipotle Mexican

Grill, Inc.*, 643 F.3d 1165, 1175 (9th Cir. 2010), the Ninth Circuit stated that "[t]he

standard requirements for equitable relief need not be satisfied when an injunction is

sought to prevent the violation of a federal statute which specifically provides for

injunctive relief."  (citations omitted).  This statement appears to be dicta, however.  *See

id.*  (stating that it was not necessary to "address the question, which the parties

vigorously dispute but which the district court did not decide, whether the Disabilities

Act authorizes a district court to deny injunctive relief after finding a violation of the

Act").

Later, in a pair of 2011 decisions, the Ninth Circuit expressly stated that, following

*eBay* and *Winter*, its longstanding precedent entitling a plaintiff to a presumption of

irreparable harm on a showing of likelihood of success on the merits in a copyright infringement case had been overruled. *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.* 654 F.3d 989, 998 (9th Cir. 2011) ("In other words, 'Elvis has left the building.'"); *Perfect 10, Inc. v. Google, Inc*., 653 F.3d 976, 981 (9th Cir. 2011)

Most recently, in *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1044 (9th Cir. 2012), the Ninth Circuit recognized that the presumption of irreparable harm was no longer permitted in copyright cases, but clarified that "[o]ur Circuit has not yet determined whether irreparable harm must be shown in order to obtain injunctive relief in all types of cases," and noted the statement in *Antoninetti* that " '[t]he standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief.'" *Id*. (quoting *Antoninetti*, 643 F.3d at 1175-76).

The central teaching from all these cases is that presumptions and categorical rules regarding irreparable harm are disfavored. Although Congress may intervene, and allow injunctions to issue on lesser showings, courts cannot lightly assume Congress intended to do away with the irreparable-harm factor in any given case. Rather, courts must carefully analyze the statute at issue "to determine whether Congress intended to make 'a major departure from the long tradition of equity practice' and create a statutory presumption or categorical rule for the issuance of injunctive relief." *Perfect 10*, 653 F.3d at 981 n.2 (*quoting eBay*, 547 U.S. at 391-92).

Here, the State relies on 25 U.S.C. § 2710(d)(7)(A)(ii). The Court does not read this statute as authorizing injunctions to be issued without a showing of irreparable harm.

This statute is not part of any general enforcement scheme and it does not lay out any particular standard relevant to issuing an injunction. Certainly, it does not expressly state or plainly imply that injunctions should issue without proof of irreparable harm. Rather, it simply says that federal district courts have jurisdiction when either a Tribe or a State seeks to enjoin certain Class III gaming activity. As a result, this Court cannot infer that Congress intended to provide for injunctive relief without requiring a showing of irreparable harm. The Court will therefore apply the traditional, four-factor test set out above. *Accord Wisconsin v. Stockbridge-Munsee Cmty.*, 67 F. Supp. 2d 990, 996 (E.D. Wis. 1999) (addressing this statute pre-*Ebay* and -*Winter*, the court held Congress did not intend to provide for injunctive relief without proof of irreparable injury).

As the Tribe points out, the State has not directly argued that it has suffered irreparable injury. Nevertheless, the record reveals that the State will suffer irreparable injury in the absence of an injunction. Perhaps most significantly, the parties concede that the State will not be able to recover monetary damages from the Tribe due to tribal sovereign immunity principles. Additionally, the Tribe believes it has the right to offer the poker tournaments and apparently will continue to do so absent an injunction.

For the reasons described above, these poker tournaments violate Idaho gambling law. The upshot is that unless an injunction issues, the State will be left without any effective remedy. The Court thus concludes that the irreparable-injury prong of the injunction test has been satisfied.

## C.     Balance of Hardships & Public Interest

The Court also concludes that the balance of hardships tips in favor of the State

and that the public interest favors an injunction.

Regarding the balance of hardships, the State has shown that it will almost certainly succeed on the merits of its claims.  As such, the State arguably does not need to show that the balance of hardships will tip in its favor.  *See State's Mot. Mem.,* Dkt. 3-1, at 10 (citing *Sammartano v. First Jud. Dist. Ct*., 303 F.3d 959, 965 (9th Cir. 2007)). Regardless, however, the Court finds that the balance of hardships tips in the State's favor – mainly because the State will not have any effective remedy absent an injunction. Damages cannot be mathematically calculated and the Tribe is immune from suit for retroactive relief.  *See id.* at 17-18.  The Tribe, on the other hand, has generally asserted that the balance of hardships tips in its favor because "the State's requested relief would directly interfere with Congress' purpose in enacting IGRA."  *Response*, Dkt. 16, at 3. As discussed above, however, the Court generally disagrees with the Tribe's interpretation of IGRA.

The Court also finds that the public interest will be furthered by an injunction. Most significantly, Idaho law prohibits gambling in the form of the Texas Hold 'em tournaments the Tribe is offering.  An injunction will serve to uphold state law and is therefore in the public's interest.

## D.      Security

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Court finds that

security in the amount of $20,000 is sufficient under the circumstances of this case. This amount may be increased, if necessary, based upon an appropriately filed motion by defendant supporting such an increase.

## ORDER

**IT IS ORDERED that:**

1. Defendant's Motion to Dismiss (Dkt. 15) is **DENIED.**

2. Plaintiff's motions for injunctive relief (Dkt. 3, 4) are **GRANTED** for the reasons described above.

3. Until such time as this matter is heard and decided on the merits, Defendant Coeur d'Alene Tribe, including its officers, employees and agents, is enjoined from conducting the poker game known as Texas Hold 'em at (a) the Coeur d'Alene Casino, or (b) any other gaming facility owned or used by the Tribe for Class III gaming that is on Indian lands within the State of Idaho.

4. Plaintiff shall post security in the amount of $20,000 no later than 72 hours after this order issues.

DATED: September 5, 2014

B. Lynn Winmill
Chief Judge
United States District Court